The next case call for oral argument is Banterra Corp. v. Cape et al. Banterra Corp. v. Cape et al. Before we begin, there is a motion, Appellee's motion to cite the affidavit and arguments not supported by the record. That motion has been taken with the case. Council, whenever you're ready, you may proceed. Good morning, Your Honor. My name is Mark Keeney. I represent Banterra Corp. v. Cape et al. This case involves a determination of the fair value of the stock of Banterra Corp. as of October 21, 2003. This determination is required by Illinois statute because Banterra was reducing the number of its shareholders pursuant to a legal merger transaction that was designed to reduce the number of shareholders to permit it to become a subchapter S corporation. I will present four points, Your Honor. First, the trial court setting the fair value of $350,000 per share was unreasonable, arbitrary, and not based on the evidence. In short, it was against the manifest weight of the evidence. Second, the trial court's award of interest at the rate of 9% was a violation of the Illinois statute, which requires the court to set the interest rate at, and I'm quoting, the average rate currently paid by the corporation on its principal bank loans unless there are none. Third, the trial court's award of expert witness fees and attorney's fees to the dissenters was against the manifest weight of the evidence because there was no evidence and the court did not find that Banterra did not substantially comply with any of the five procedural requirements of this statute. And secondly, there was no evidence and the court did not find that Banterra acted arbitrarily, vexatiously, or not even fake. Fourth, the trial court erred in its application of Illinois law when it denied Banterra's motion for a change of judge as a matter of right. Now, let's talk about the $350,000 per share issue. Of the five experts that testified in this case, only one, the dissenter's expert, gave an opinion that the $270,000 per share set by Banterra was not fair value. The trial court did not support its finding of $350,000 per share on the testimony of that dissenter's expert, however. Rather, it justified the $350,000 figure, mostly based on isolated statements either in the testimony or the reports of the experts called by Banterra, who all opined that $270,000 was fair value. These isolated statements, taken out of context or in disregard of critical qualifying statements made by those experts, made the court's finding unreasonable. The experts' reports, especially the Stiefel report, which was Exhibit 1.070, were very broad examinations of a wide spectrum of data that is generally considered in any valuation and assessment of the value of a bank's stock. Much of it, as stated by these experts, was general background data and not that illuminating to the specifics of the value of the Banterra stock. Many factors were discussed, and those that were most significant and important were identified by the experts and explained. A good illustration of the broad scope that they took, then followed by narrower refinement, is the four sets of data contained in the Stiefel report. First of all, it was of all bank mergers and acquisitions in the U.S. since 2003. There were 62 of those. Secondly, they more narrowly focused on Midwestern banks since 2003. There were 24 of those. Thirdly, they focused even more specifically on eight Midwestern banks that had similar return on assets as to Banterra. And finally, the fourth group looked at was ten selected banks that weren't the subject of mergers and acquisitions but were publicly traded, so their prices were on the market. These experts explained that the broad approach to a large number of dissimilar banks is not especially illuminating with respect to evaluating the value of one particular bank here in southern Illinois. I think all experts agreed on that principle, with the exception of Dr. Mather, the dissenters expert. Also, the experts testified that even with the more focused examination of the banks, that care had to be taken in using the various factors that were listed, which were manifold, in evaluating the per share value, fair value of Banterra's stock. What about the testimony of Mr. Ross and Mr. Swartz? Do you want to comment on that? For example, the Ross testimony, he testified that on page seven of tab one of the Stiefel report, of the eight ratios that he examined, he said two were most important. He said price-to-book value and price-to-tangible value. And on those two most important measures, Banterra's price was right in the middle, ranked 50th and 63rd percentile rank, respectively, on those two most important factors. He also testified, Ross did, that on page ten of tab one of the Stiefel report, that's where they had the ten selected publicly traded banks in the Midwest, that Banterra's $270,000 price was right in the middle of two significant indicators that he identified. Price earnings was in the 50th percentile, and price-to-tangible book was in the 50th percentile. So, to quote isolated portions of the expert testimony, without regard to these experts' testimony regarding explanations of that data, is to engage in cherry-picking that distorts the conclusion of the expert. I think another good illustration of this is found in the dissenter's brief at page eight, where they say that there was a wide range of values given, and they say, for example, there was testimony that 509,000 could have been a fair value. Well, that 509,000 was a figure taken from the highest of the ten selected banks in the Midwest on one of eight multiples, and no testimony was given by any expert that that figure of 509,000 was fair value for Banterra. So it's illustrative, though, of the pulling out of an isolated fact and saying, oh, that justifies this figure. In addition, Your Honor, the trial court's opinion reflects a misunderstanding of a key graph in the Stiefel report. That graph is on page 11 of tab one, and it's clear the court really relied on that graph, because on page six of the judgment, the court says the most telling portion of Mr. Ross' testimony was in regards to this graph. The court specifically questioned Mr. Ross about it, and he said, if you're just eyeballing that particular graph to put this particular transaction in the median on that particular graph, eyeballing it would be in the neighborhood of $350,000, correct? And the answer was yes. If you just eyeball that graph. The defense counsel encouraged the court by stating on page, the state court transcript 102, for the court's edification, it's section one, page 11. A picture is worth a thousand words. It is clear this is the exact figure the court picked as the fair value, that $350,000. So it's clear that the court relied upon that. But this graph is misleading because its graphic impact is distorted by the fact that the disparity between the maximum implied price and the median is about, and I calculated from going through all the figures, is twice as high as the disparity between the median and the low figure, which indicates, to the point you may not agree, that that is a result of statistical outliers on the maximum implied price. All the experts that you presented testified that the $270,000 was a fair price, correct? It was fair value, yes, sir. But it was not the only value. I don't recall if they were specifically asked that question, Your Honor, but I would agree with you that the experts all was implicit in all the testimony that there wasn't just one fair value price, that there was a range, and they all said that they thought that the two, at least all of ours testified, that they thought that the $270,000 was within that range. So the trial court had the range from Ross from $509,000 to $200,000, Hargrove from $370,000 to $247,000, Swords from $351,000 to $287,000. No, I don't think that's correct, Your Honor. The $509,000, no one gave the opinion that that was within the range. That was just one figure in one graph on one measure of, I think it was price, I'm not sure which measure it was, but no one testified that $509,000 was within the range of fair value. So if there's an exhibit that's referenced in the brief of Kate that says $509,340, that would be an error? That figure is taken right from the Stiefel report that shows, when it's got the maximum implied value and it's got the eight different measures and ratios, that's one of the ratios. But my point is that no one testified that that one ratio was a fair value. Not even the plaintiff's expert testified that. His testimony, he gave two figures, $429,000 and $402,000. But, I mean, it illustrates what we're talking about. When you go through a lengthy, broad report like that and you just pick out one figure and say that's the fair value, that wasn't the testimony. In any event, Your Honor, the court also relied on comparison groups that weren't focused on similarity to Banterra. It also ignored contemporary sales of four shares of Banterra that occurred just about at this time at $270,000 per share. The court also misunderstood the differences between two different discounted cash flow methodologies. One was the Gordon Grove model used in the Sorens report, and the other was the adjusted capital asset pricing model used in the Stiefel report. Because of the time, I would just suggest to the court, if you look at the Stiefel report at tab 7, page 1, you can see that his method of discounted cash flow, where he used the figures like 12%, 14%, and 16% to discount the present-day value, are not at all analogous to the Sorens report, where he used 6.99% as the dividend growth rate that he calculated. Totally different calculations arrived at totally differently. Time does not permit, Your Honor, because of the volume of these, but I would just mention to the court that we pointed out in our brief a whole series of misunderstandings reflected in the trial court opinion. Those are reflected in our opening brief on pages 10-11, 14-27, and 31-36. I'd like to move on to the 9% interest award, if I may. The trial court's judgment does not reflect that the interest award was based on the controlling statute. Rather, the judgment simply states that Illinois law, in quotes, finds that judgments recovered in any court shall draw interest at 9% per annum from the date of judgment until satisfied. The court's decision says that the court should apply the statute that is in existence at the time the lawsuit was initiated and should award an interest rate that the court finds to be fair and equitable, citing the Weigel case, but it never cites the controlling statute. And the Weigel case was decided under a prior statute that's not controlling in this case that talked about setting an interest rate that the court finds to be fair and equitable. In short, it's clear the court was not relying on the controlling statute, but rather on Weigel, a case that it misread and applied a statute that was in effect in 1987, not in 2004 when this case was filed. The only evidence of the average rate currently paid by Venterra on its principal loan was given by Jim Morris. Nobody contradicted that evidence. No one gave any contrary evidence. The court did not say that it found that evidence not credible. Interest should have been awarded at 6%. And if I can go to experts and attorneys' fees, Your Honor. The legal standard to award experts and attorneys' fees is set forth in the Illinois statute and it provides under one of two circumstances may they be awarded. First, if the court finds that the corporation did not substantially comply with any of the five procedural requirements in the statute, there was no such finding and those procedural requirements all were met. Secondly, it can award them if it finds that the party against whom the fees and expenses are assessed acted either arbitrarily, vexatiously, or not in good faith with respect to the statute. Nowhere in the court's opinion is there any finding that any of those requirements were met. And furthermore, while the dissenters would like to say we can infer it found that, I don't think that there's any factual evidence in the record on which such an inference can be found. Judge Schwartz did state in his opinion that Plaintiff undervalued its stock and then sought support of its valuation through expert testimony. But keep in mind that Jim Morris testified that the $270,000 figure was arrived at by a back and forth with Stiefel Nicholas and Banterra's executive management. He said Mr. Ross, the man who testified about the report, was not involved in that back and forth. Furthermore, that $270,000 figure was supported by the testimony of three highly qualified, reputable, experienced experts. And the only one who disagreed with that was Dr. Mather, a man of very limited experience in valuing banks who set forth in her opening brief. Nothing in the statute requires, as the dissenters suggest, that a corporation has to go out and get an independent third party to come in on its own and just set a value. They argue that, but there's no sight of any case law or any statute saying that. Further, even if it were shown, which it wasn't, that Banterra set the price itself, that does not show the price was set in bad faith, arbitrarily or vexatiously. There was simply no evidence to support the finding that Banterra intentionally and knowingly undervalued its stock. All the evidence except for Dr. Mather was that the $270,000 was a fair price. Lastly, I want to address the change of judge motion, Your Honor. Under the Illinois statute, a party is entitled to one change of judge as a matter of right if it is presented before the trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case. Generally, but not always, we admit, but generally, discovery motion rulings are not considered substantial because they are not generally directly related to the merits of the case. Here, Your Honor, the production of these tax returns was not directly related to the merits of the case. Essentially, the same information had already been given to them in financial returns, annual reports, bank reports that they all have. And if you look at the briefing on this, you can see that the arguments that were made weren't that they didn't have the information. They wanted to be able to check how we treated the tax returns. The opinion also makes clear that tax returns were not an issue in this case. They were admitted, but you see no argument about them and no real reliance by the court. It wasn't a big issue. The motion also was not filed. The senators argued that, well, even if it was a substantial issue, it was after you tested the water. And the motion, Your Honor, though, was not filed after testing the water because the motion was filed within days after receipt of the information upon which the motion was based was learned. The affidavit of Mr. O'Brien, if the court will consider it after looking at the affidavit, was filed four business days after learning the facts that led to the filing of that motion for substitution. And the decision to make that motion was made four business days after learning those facts. Was that brought to the attention of Judge Clark? It was, well, what happened, Your Honor, was the decision was made to file, I believe, on a Thursday. It was mailed to Mr. Van Winkle for filing. The judge, I think, on Wednesday had made his decision, but it wasn't communicated. No, I understand that, but maybe I'm not being clear. The argument that the motion for substitution should be granted because this wasn't in response to an adverse ruling based upon this, was that information conveyed to Judge Schwartz prior to his ruling denying your motion for substitution? I don't think it was, Your Honor, because it was never an issue. No one argued that that's why it was filed. The argument was that if you look at the briefing and his decision, it was all centered around the issue of whether this was a substantial ruling. Then why should we consider it if the trial court didn't consider it, I guess is my question. Well, I agree with you. I didn't raise it. No, no, your affidavit. The affidavit. If the trial court didn't consider it. Because, Your Honor, that was first raised as an issue in the dissenter's brief in this case. They're the ones that brought it up. I didn't file this affidavit until after I read their briefing, which they said, hey, this was testing the waters. You guys filed it after you found out what the judge was going to do. That was the first time it had been raised. That issue was never raised in front of the trial court. That's correct. It was only the issue of whether or not this was a material ruling or substantive ruling. That's correct. So, in short, Your Honor, the sole basis for the trial judge's decision on the substitution motion was that he had ruled on a substantial issue. And there's no mention at all, nor argument, of the testing of the waters theory that the dissenters now alternatively assert. In short, Your Honor, we would ask the court to reverse the trial court's finding of $350,000 of fair value, reverse the trial court's finding awarding the dissenter's interest at 9%, reverse the trial court's finding awarding attorney's fees and expert witness fees, and lastly, to grant Pantera a new trial for a new judge. Thank you, Your Honor. Thank you, counsel. Counsel? Thank you. Please, the court. Counsel, before you get to your main argument, could you just address that one last point there that we can dispose of the Yes, Your Honor. At least in my mind, mostly. Thank you. Was the issue of testing the waters raised before Judge Schwartz, and was that one of the basis of his ruling? Or was it strictly on whether or not this was a substantial material issue to tax returns? And the response is, yes, it had been raised, and I understand this gentleman wasn't there and didn't try the case, but at C-235 through C-239 of the record, we filed a brief with respect to the motion for substitution, and in that brief, which was briefed back and forth before the judge ruled on the motion for substitution, we brought up that they had tested the water, that they, in fact, knew. And if I could continue on that line just for a minute, the substitution involved not only testing the water with this October 9th ruling that was issued, but going back to May the 22nd, we had a conference call with the judge, which is noted in the docket entry, that says, Attorney O'Brien present. Discovery issues discussed. Attorney O'Brien asked that he be given seven days to attempt to resolve the issue with his client. The court states its thoughts on the subject, so the discussion will consider the likely ruling from the court. That's on May the 25th, long before the October 9th ruling by the court with respect to the discovery issue. Now, I'd like to point out just a couple more things about the proposal to submit the affidavit. We had spoken to this. It had been spoken to when we originally filed our motion with respect in opposition to their motion for substitution. But I'd like to point out to the court that in his affidavit, Mr. O'Brien indicates that this all happened at the last minute, and that he mailed this thing, he fairly expressed his motion for substitution off on the 11th day. That would be the 11th day of October, so Manley could hand deliver it to the court. But the unusual thing about that is that O'Brien signed a letter to the circuit clerk dated October the 12th. He signed the certificate of service dated October the 12th. Now, the certificate of service is in the record. The letter to the clerk is not in the record, but I found it last night at 11 o'clock. It's dated October the 12th. The motion was actually filed with the clerk on October the 12th, and we would submit to the court that Mr. O'Brien's memory is not accurate about the FedEx to Jim VanWinkle, as stated in his affidavit. He signed the letter on October the 12th. He signed the proof of service on October the 12th. There's no question it was hand-delivered to the court and filed with the circuit clerk on October the 12th. But this implication that they made their minds up before they received the court's order with respect to discovery ignores two things. Number one, the court's order was signed on October the 9th, and number two, going back to May the 25th of the same year, the court had already indicated how they were going to rule with respect to this matter. And if I could follow up and continue with respect to the substitution issue and whether or not it was a substantial ruling, I would like to address that, please. This ruling on discovery telling Banterra that they had to, were required to turn over these tax returns was hotly contested. There were motion or memorandums filed on each side of the issue. There were 140 pages worth of documents submitted with a six-page brief filed by Banterra addressing this particular issue. At the same time that all of this is going on, they are submitting that this is a matter of privilege, that these tax returns are privileged. And if you read Banterra's brief with respect to Banterra's brief in opposition to our motion to compel them to provide the tax returns, they cite privilege over and over and over. Well, privilege is an evidential issue. You know, if they're not privileged for discovery, they're certainly not privileged for trial purposes. And that's evidenced by Mr. O'Brien. When we sought to introduce the tax return, Mr. O'Brien says, Your Honor, I'm reminded that that is what the motion goes to. We have no objection to them. You ordered them produced. They are what they are. They're authentic. And we would just reserve our rights to make in terms of admissibility. No objection, but only the comment is if there's new matters in the testimony. And then he goes on to address objections that may come with respect to how those tax returns are used. But it was clear to everyone, and certainly clear to Mr. O'Brien, as evidenced by his statements for the record, that when they produced those tax returns, those tax returns could be introduced into evidence, and no objection would be entertained by the court. It was an evidentiary ruling. We got the tax returns. If the privilege issue failed for discovery purposes, it certainly wasn't going to prevail for evidentiary purposes. They knew what was being contested there. It was our ability to introduce the tax returns into evidence at trial. We couldn't introduce them until we got them. They didn't want us to have them on a privilege issue. So they fought tooth and nail. Just because you introduce a document into evidence doesn't necessarily make it material or doesn't make it a substantial matter, does it? Yes. Don't that show the context of the nature of the document? The introduction of the tax returns into evidence was necessary to make sure that Bankera couldn't take issues with their experts that were inconsistent with the treatment on the tax returns. And, of course, you know. They argued that there was other evidence that you all had, to make sure that their witnesses didn't overstep their bounds there. Exactly, Your Honor. That is the argument that they made in their memorandum in opposition to the motion to compel. They said we had that same information elsewhere. But, in fact, the information that's elsewhere were in snippets of footnotes to financial statements as opposed to being the tax returns as a whole. We couldn't determine what the tax return said and couldn't argue before the court what the tax return said based upon the footnotes of the financial statements. Footnotes are a synthesis or a short form of what the tax return actually says. It was an important ruling. It was hotly contested. They knew it was evidentiary. If we got the tax returns of discovery, the privilege issue was gone in terms of submission to the court for preventative purposes. Mr. O'Brien knew that. He admitted that when he made no objection, said the court had already ruled on that matter. That's in the record. We have cited that in our brief. The test in the water issue, this whole issue about the tax returns went on. We filed our motion to compel. Just so happens that we had a conference, a status conference with the judge six days later. And at that status conference, the issue of discovery came up. And the judge told them, and I previously recited from the doc sheet, which is at C3, the judge told them, I don't think they're privileged. I think they come in. I think you've got to produce them. But go talk to your client about it. Mr. O'Brien asked seven days to discuss the matter with his client. He apparently discussed the matter with his client, and they decided they were going to produce them after the fight. So we got this six-page memorandum, 140 pages' worth of documents that they claimed was – showed that we already had the information and that it was readily available through another source, as the court asked. Are there any other questions on the issue of substitution? We think that the whole idea of the affidavit is disingenuous, and if the court would entertain the affidavit, I wish the court would entertain my solemn oath that we have a letter here signed October the 12th by Mr. O'Brien addressed to the clerk of the court with the motion. If he mailed it to Jim VanWinkle by FedEx on the 11th, he signed the letter on the 11th, and he signed the proof of service on the 11th and dated it the 12th. Are those documents part of the record on appeal, the letter? The letter is not part of the record on appeal. We have that, and if you're going to entertain his affidavit, we would submit the letter. Well, you have to file a motion of some kind before we're going to entertain it. I'm sure of that. But the proof of service is signed by Mr. O'Brien, and it's dated the 12th. So he would have had to mail the proof of service and the motion to VanWinkle on the 11th. I understand your argument. It's not part of the record yet. Why don't you file a motion if you feel that's appropriate and recite all that? We'd be pleased to do that. Thank you. The proof of service, Your Honor, is a matter of record, and it is dated the 12th, and it is signed by Jim O'Brien. So he would have had to sign it on the 11th, FedEx it to VanWinkle, and have dated it the 12th on the 16th. Now, if I may progress, I'd like to speak to fair value. Ross was not charged, Ross and Stifel Nicholas, was not charged with finding the fair value. He wasn't charged with finding the fair value. He was charged with finding the parameters for fair value. And as shown in our brief, all of the witnesses came up with parameters for fair value. And in those parameters, which was wide and broad, they said that, as the wider court has said, that indeed this is not an exact science. You just don't pick a fair value, and they each came up with broad ranges. The fair value ranges included the large numbers that the court was told about just now, but it also included, Mark Ross had this high of $509,340 and a low of $200,000. In fact, Jerry Soares, in his second report, one of Banker's own witnesses, opined that this range of value was a low of $287,000 and a high of $351,000. So one of their own witnesses said within the range of value was $351,000. Now the testimony was all over the place about betas, discounts, and determination of value and compounded annual growth rates. And in footnote 5 of Banterra's brief, they would have us believe that a discount factor is different for one formula than it is for another formula. And I think this gentleman took a shot at arguing that earlier. In fact, gentlemen, if you read the entire record and look at Banterra's Stifel-Niklas Fairness opinion, you'll see that the discount rate is the discount rate is the discount rate. The same term, the number, is used in different formulas in different places, but all with a view toward coming back to the fair value. Now, the lower discount rate means higher value. Higher discount rate means lower value. We would submit Banterra's evidence presented showed that the discount rate was used to manipulate the bank. By using the high discount rate and low internal growth rate, which just were inherently not well founded, they were able to try to suppress the bank. In fact, their own witness, Soares, used 6.99% when one of their other witnesses used a range of 14% to 16%. Hargrove, one of Banterra's witnesses, said you would not know anything about banking if you used 6.99%. But the discount rate is the discount rate is the discount rate. Just because they had different opinions about it, that's why we have a trial judge to listen to all the evidence and figure out why this guy says it's 6.99%. Ike Mather said it was 8%. Soares said 6.99%. Hargrove said 12%. And Stifel said 14% to 16%. But still the same number. And the judge, some judge, sometimes has to make a determination about what's credible and how it's to be determined. When you value real estate, you usually look at comparable sales. Could you comment on the allegations or the fact that there was at least two contemporary sales for approximately $270,000? I will do that. In anticipation of the merger, two parties sold some of their stock. One party, Mr. Maloney, sold one share of stock and kept four. The other party, Mr. Parker, sold three shares of stock and kept seven. Now, we would submit to the court that they hedged their bet. They sold part of their stock, but they had more confidence in keeping four shares and selling one for $270,000 than they did sell them all for $270,000. If it was fair value, they may have been motivated to sell for $270,000. I agree that a comparable sale makes a difference, but I think the court also needs to look at 90-some-odd percent of the parties determined to take the stock instead of taking the $270,000. If we're selling widgets and we say our widgets were $270,000 and we go to the market and over 90% of the people say, I'm not selling my widget for $270,000. I'm keeping my widget. That tells me the value of the widget is above $270,000. That's what happened in this case. All of the parties who were invited to participate in the merger, every one of them elected to take the stock off of them in the merger instead of the $270,000. That's in the record. The only people that got the $270,000 were the people who were not invited to participate in the merger. We've got 393 shares of stock that said my stock is worth more than $270,000, so I'm not going to sell my stock. I'm going to participate in the merger. And those that were forced, those that were not invited to participate in the merger, they got $270,000 to share. Are you suggesting that it's not an arm's length transaction, that it was a forced sale? It was a forced sale. The minority shareholders were forced out. They were forced to take the $270,000, and if they didn't like it, they would send a notice to Banterra, and Banterra had to file an action with the court, which they did, for determination of fair value. Our clients didn't have a choice. In fact, there's testimonies. No, the ones that sold $270,000. Are you saying that they were forced to take the value that Banterra said? They were forced to take the $270,000, but they had an opportunity to ask a court to make a determination of fair value. They all received, all of my clients received $270,000 to share, but they also said, we think it should have been more. The court, Judge Schwartz, after hearing all the evidence, determined that the fair value was $350,000, so each one of my clients receives an additional $80,000 for their shares. If this court determines that, in fact, Judge Schwartz did not abuse his discretion. When you use the word forced, that's all they were offered. They weren't, nobody can force me to sell my stock. Sure they can. Pursuant to the statute, they can do a merger, and they can force the minority shareholders to take what is supposed to be fair value. The minority shareholders have rights under the statute to come back and ask the court to determine what fair value should have been. But my clients don't have the shares anymore. They were paid pursuant to the merger agreement, and they took $270,000, and the great thing about state law, we've got this Senator's Rights Statute where you have to reinforce the courts and say $270,000 is enough, you should pay me more money. But the two gentlemen that did sell the four total shares, I guess, could have refused the $270,000 and said we're going to go to court, right? Absolutely. And the point is, one of them sold one share in Cat 4, the other one sold three shares in Cat 7, so they certainly didn't buy into the process, and the other 393 shares said we're not taking $270,000,  they could have said we don't want to go through the merger, we're going to take the offer to price. If I could speak to fair value just for a minute. The best evidence for this trial were the pantheric dissenters, as we refer to them, the appellees in this case, was the Stifel Report. In the Stifel Report, and the record reflects that if the judge asked an awful lot of questions, and the panther wants to cherry pick and isolate that one instance where the judge said, well, isn't the median of all those $350,000, but if the court looks at the record, you'll see that judge courts ask questions about the ranking of this deal to other deals. And as you read this, please understand that a low ranking means that this deal of $270,000 was either a good deal if it's ranked number one, or a bad deal if it's ranked the last number. And I'd like to point out the rankings here. Ranking the deal under 62 all-cash mergers and using price to last 12 months earnings, which is very, very important according to these people, our deal ranked 46 out of a total of 49. Now, it was ranked out of 62, but 13 for statistical purposes Stifel took out. For the 24 all-cash mergers, ours ranked 21 out of 22. That means we got the second worst deal that there was at $270,000 a year. And using the 8, the footnote says, page 7 of tab 1, they took one out. We ranked 7 out of 7 on that all-important criteria. That is, on price to last 12 months earnings, Bancara at $270,000 was the worst deal out of the 7 sites. Thank you, Counsel. Thank you very much, Jeff. Counsel? Your Honor, I'm just going to take some of his comments in the order they came. First of all, I was not, he's correct, I was not a trial counsel at that time. I was not there at the time. But I can tell you, Jim O'Brien, the guy I work with, I've talked to about these issues. I can tell you that the best evidence as to whether or not testing the waters was an issue before Judge Schwartz. Read his opinion. It's at 821 of our brief. It's a part of the record. There's not a word in there about testing the waters. It's solely based on a ruling that he said was on a substantial issue. Secondly, on this October 12th, October 11th, I don't know the letter he's talking about. And I'll be happy if he files whatever, and I'll have O'Brien then file a response to it, and then the court can have the complete record before it. Third, the indication that these tax returns were highly significant is totally illusory. If you read Judge's opinion, there's not a mention in there about the tax returns. There's not a mention in seven volumes of transcript about these tax returns, other than the move to admit them, which was unobjected to. So the fact that these tax returns came in, the fact that there was an argument about it, the fact that Banterra felt they had a qualified privilege not to produce tax returns, he already had the information, is really immaterial to the substance of this case. It played no role in the outcome of this case. And the question about whether Mr. O'Brien knew what the ruling was going to be, I specifically asked O'Brien, did you know? Did the judge say what he was going to do? His memory was that the judge indicated he wasn't really persuaded by the federal law, but he didn't indicate what he was going to do. The fact that he had ruled that, he would have had a roof and a bench. That argument was in March. It was almost five months later before his ruling came down in October. Also, there was a statement that Swartz testified the fair value was between $350,000 to $370,000 per share. I think that's what it was. That, in fact, was not Swartz's testimony. Swartz said that those figures were based on phony, incorrect numbers that he didn't believe he didn't credit. His testimony was that $270,000 was the fair value. The other thing about the Swartz report, 6.99% in the Stiefel report, all I would say to the report is just look at Exhibit 1.013, Exhibit 4, that's the Swartz report, and he shows you how he came up with that 6.99%. You can tell from looking at that, that's not equivalent to a Stiefel report, which is at tab 7, page 1, in which the Stiefel people came up with present-day value discounts, which are totally different, and that's when you take cash now and then you discount it based upon what the earnings are projected to be over the time period of the loan. You see I'm running out of time. To get to your question, Judge, the Parker and Maloney sales were not for sale. Those were sales simply made by Parker and Maloney, and if they're right, that everyone really knew it was $350,000, these people would have left $320,000 in the table. Could you comment on Puzzling Counsel's argument that Ross testified that Banterra ranked 21st out of 22 banks? Yes. And was there relevance to that? Yes, Your Honor. Why that should not be relevant? I'm not saying it's not something that should be looked at, but those are isolated things picked out that disregard the testimony of the expert who wrote this report, who said here's what the things that are important, here's why they're important, and those items that they refer to are part of a massive general data on all kinds of indicators that they cherry-picked out because they were helpful to them. And the record will show that. And the record shows that, and I think it's indicated such in her brief. So in any event, oh, the last point I want to make is, Your Honor, that when they argue about all these people taking this offer, I would point out the converse of this. Seventy-two shares were cashed out in this merger transaction. Almost 90 percent, I think it's 88 percent of them, is elected not to participate in the dissenter suit and apparently were satisfied with the 270. So if you want to talk about what people were satisfied with and weren't satisfied with, the overwhelming majority were satisfied. Thank you, Your Honor. Thank you, Counsel. We appreciate the briefs and arguments of counsel. We'll take this case under advisement.